**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ANDREA GREENE, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>-against-<br><br>PIPING ROCK HEALTH PRODUCTS, INC. d/b/a NATURAL HEALTH VITALITY,<br><br>Defendant. | : | CIVIL ACTION NO.<br>2:24-cv-08383-JMA-LGD |

**PIPING ROCK HEALTH PRODUCTS, INC.'S**
**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**


Jeffrey S. Jacobson
W. Joshua Lattimore
**FAEGRE DRINKER BIDDLE & REATH LLP**
1177 Avenue of the Americas, 43rd Floor
New York, New York 10036
Tel.: (212) 248-3191
Jeffrey.Jacobson@faegredrinker.com
Joshua.Lattimore@faegredrinker.com

*Attorneys for Defendant*
*Piping Rock Health Products, Inc.*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .......... 1

STATEMENT OF FACTS .......... 3

LEGAL STANDARD .......... 6

ARGUMENT .......... 7

I. It is the Norm in this Circuit to Require Laboratory Testing for Claims Such as Those Greene Has Pleaded to Survive Motions to Dismiss. .......... 7

II. Greene's Georgia Fair Business Practices Act and Fraudulent Concealment Claims Fail Because the SAC Does Not Satisfy Fed. R. Civ. P. 9(b), and Greene Cannot Establish Any Legally Cognizable Duty on the Part of Piping Rock .......... 13

III. Greene's Express Warranty Claim Fails for the Additional Reason That She Fails to Plead She Provided Notice of the Alleged Breach. .......... 16

IV. Greene's Implied Warranty of Merchantability Claim Should Be Dismissed for the Additional Reason That She Is Not in Privity with Piping Rock. .......... 16

CONCLUSION .......... 17

WORD COUNT CERTIFICATION .......... 18

## TABLE OF AUTHORITIES

**Cases** **Page(s)**


*Albert v. Distrokid LLC*,
No. 25 Civ. 1705, 2026 WL 710041 (S.D.N.Y. Mar. 13, 2026) .......... 13

*Amavizca v. Nutra Mfg., LLC*,
2020 WL 8837145 (C.D. Cal. Oct. 20, 2020) .......... 9, 10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 6

*Botterio v. Tessel*,
2025 WL 3718713 (E.D.N.Y. Dec. 23, 2025) .......... 13

*Burch v. Pioneer Credit Recovery, Inc.*,
551 F.3d 122 (2d Cir. 2008) .......... 13

*Calvin v. Schmitt*,
2017 WL 4280683 (S.D.N.Y. July 7, 2017) .......... 6

*Carder v. Graco Children's Prods., Inc.*,
558 F.Supp.3d 1290 (N.D. Ga. 2021) .......... 16

*Cohen v. Nutricost*,
747 F.Supp.3d 467 (E.D.N.Y. 2024) .......... 12, 13

*Dib v. Apple Inc.*,
2026 WL 483057 (N.D. Cal. Feb. 20, 2026) .......... 9

*DM Manager LLC v. Fidelity Nat'l Info. Servs., Inc.*,
2025 WL 863338 (2d Cir. Mar. 19, 2025) .......... 6

*Dunning v. Supergoop,LLC*,
2026 WL 501627 (S.D.N.Y. Feb. 24, 2026) .......... 11

*Dunning v. Supergoop, LLC*
2025 WL 34822 (S.D.N.Y. Jan. 6, 2025) .......... 10, 11

*Fahey v. Deoleo USA, Inc.*,
2018 WL 5840664 (D.D.C. Nov. 8, 2018) .......... 11

*Francoforte v. Graco Children's Products, Inc.*,
2026 WL 582859 (N.D. Ga. Jan. 7, 2026) .......... 14, 15

*Gaminde v. Lang Pharma Nutrition, Inc.*,
2019 WL 1338724 (N.D.N.Y. Mar. 25, 2019) .......... 10

*Giddens v. TIFT Regional Health Sys., Inc.*,
2026 WL 555070 (M.D. Ga. Feb. 27, 2026) .......... 13

*Incantalupo v. Lawrence Union Free Sch. Dist.*,
652 F. Supp.2d 314 (E.D.N.Y. 2009) .......... 6

*Knight v. American Suzuki Motor Corp.*,
612 S.E.2d 546 (Ga. App. 2005) .......... 16

*Lozano v. Bowmar Nutrition LLC*,
2021 WL 4459660 (C.D. Cal. Aug. 19, 2021) .......... 9

*McClure v. Toyota Motor Corp.*,
759 F.Supp.3d 1333 (N.D. Ga. 2024) .......... 14

*Paul v. Ingersoll-Rand Co.*,
No. 10 Civ. 708, 2011 WL 13269791 (N.D. Ga. Jan. 14, 2011) .......... 16

*Paws Holdings, LLC v. Daikin Applied Americas Inc.*,
2018 WL 475013 (S.D. Ga. Jan. 18, 2018) .......... 16

*Rivera v. S.C. Johnson & Son, Inc.*,
2021 WL 4392300 (S.D.N.Y. Sept. 24, 2021) .......... 6, 7, 8, 9

*Stein v. Tangoe, Inc.*,
No. 13 Civ. 286, 2014 WL 12767210 (D. Conn. Sept. 30, 2014) .......... 6

*Stern v. Electrolux Home Prods., Inc.*,
2024 WL 416495 (E.D.N.Y. Jan. 30, 2024), *R. & R. adopted at* 2024 WL 4297656 (E.D.N.Y. Sept. 26, 2024) (Azrack, J.) .......... 6

*Vaglica v. Reckitt Benckiser LLC*,
699 F.Supp.3d 200 (E.D.N.Y. 2023) .......... 7

*Wiggins v. Unilever U.S., Inc.*,
684 F.Supp.3d 127 (S.D.N.Y. 2023) .......... 6, 8, 9

*Williams v. Dresser Indus., Inc.*,
120 F.3d 1163 (11th Cir. 1997) .......... 14

**Statutes, Rules & Regulations**

21 C.F.R. § 101.9(c)(6) .......... 2

Fed. R. Civ. P. 12(b)(6) .......... 1, 6

Fed. R. Civ. P. 8 .......... 14

Fed. R. Civ. P. 9(b) .......... 6, 13, 14

Ga. Code Ann. § 10-1-390 *et seq.* .......... 14

Ga. Code Ann. § 10-1-399 .......... 16

Ga. Code Ann. § 23-2-53 .......... 14

**Other Authorities**

https://en.wikipedia.org/wiki/Magnesium_citrate .......... 4, 5

https://en.wikipedia.org/wiki/Magnesium_citrate_(3:2) .......... 4, 5

## PRELIMINARY STATEMENT

Plaintiff Andrea Greene's Second Amended Complaint ("SAC"), premised on nothing more than citations to Wikipedia and an inexcusable misreading of the challenged product's federally mandated Supplement Facts Panel, is implausible, and the Court should dismiss it pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted.

Greene alleges that a "Calm Gummies Magnesium Supplement" (the "Product") sold by Defendant Piping Rock Health Products, Inc. ("Piping Rock") lacks the promised 330 milligrams of magnesium per serving, derived from magnesium citrate, promised on the Product's label. Of course, the amount and source of magnesium in the Product are knowable, testable, provable facts. It is customary for a plaintiff to obtain test results from a reputable laboratory before making the serious charge that a product is mislabeled. Indeed, courts in this Circuit routinely dismiss claims like Greene's when *not* supported by reputable lab testing. Greene, however, did not test the Product or did not allege the results of any such testing.

Instead, Greene came to this Court armed only with a misunderstanding of how federal rules require companies like Piping Rock to display gram weights on a Supplement Facts Panel.

Greene purports to have weighed the Product and found the weight of a single gummy to be 2,405.5 milligrams, or 9,622 milligrams for a four-gummy serving. (*See* SAC ¶ 15.) Fair enough. Although gummies are baked products that can vary slightly in size and weight, 2,405.5 milligrams is a plausible weight for the Product. The Supplement Facts Panel for the Product states that the "Total Carbohydrate" weight for a single gummy is "2g." From that, Greene concluded that 2,000 milligrams of the 2,404.5-milligram weight of the gummy consists of carbohydrates, purportedly leaving only 404.5 milligrams available to constitute the weight of magnesium citrate in the gummy. (*See id.*) Citing articles she (or her attorney) found on Wikipedia (*id.* ¶ 16 & nn.2-3), Greene alleged that magnesium citrate contains no more than 16.2% magnesium. Multiplying

404.5 milligrams by 16.2%, Greene calculated that a gummy could contain only 65.53 milligrams of magnesium derived from magnesium citrate, or a total of "262 mg of magnesium per [four-gummy] serving . . . not 330 mg of magnesium as warranted on the [Product's] label." (*Id.* ¶ 17.)

Greene's calculations, however, began with an incorrect premise that the "2g" stated weight for carbohydrates on the Product's Supplement Facts Panel meant that carbohydrates in the gummy weighed a full 2,000 milligrams. Greene's error is illustrated as follows:




The rule governing carbohydrate disclosures on a Supplement Facts Panel, 21 C.F.R. § 101.9(c)(6), requires Piping Rock to display the Product's carbohydrate weight "expressed to the nearest gram." This means that any actual weight of carbohydrates between 1,500 and 2,000 milligrams must be displayed as "2g" on the Supplement Facts Panel. Greene ignored this. Yet, so long as the actual carbohydrate weight of a gummy is 1,892 milligrams or less—rounded up to two grams on the Supplement Facts Panel, as required by the regulation—Greene's math fails. At that weight, a 2,405-milligram gummy could contain 513 milligrams of magnesium citrate, which, at 16.2% magnesium by weight, is enough to provide 83 milligrams of magnesium per gummy, or 330 milligrams per 4-gummy serving, as promised. In other words, Greene's Wikipedia-fueled assumption that the Product cannot deliver the promised amount of magnesium from magnesium

citrate is based on an unwarranted and simply false assumption, and any reputable testing of the Product would have shown Greene's theory about the ingredient weights to be wrong. But Greene alleges no such testing. Nor can she provide any reason why the Court should assume, in the absence of testing, that the carbohydrate weight of the gummies was not rounded up from a fractional weight as required by the regulation.

Because Greene came to Court without lab test results or equivalent support for her claims, the Court should dismiss the SAC. And because the SAC was Greene's third attempt to plead a claim, after Piping Rock put Greene on notice multiple times of its intent to argue for dismissal based on the absence of lab testing or equivalent support, the dismissal should be with prejudice.

## STATEMENT OF FACTS

Greene, a resident of Georgia, claims she purchased the Product in Georgia in June 2024. (*See* SAC ¶ 4.) She alleges that both the quantity of magnesium in the Product (330 milligrams per four-gummy serving) and the source of the magnesium (magnesium citrate) were important to her and to other consumers. (*See id.* ¶¶ 8-9.) Based on the math outlined above, and based on her assumption that each gummy contains two full grams of carbohydrates and not a smaller amount rounded up, as required by applicable regulations, she asserts that the Product either does not contain the promised amount of magnesium or that the source is a different (and allegedly less desirable) form of magnesium, such as magnesium oxide. (*See id.* ¶¶ 14-19 (describing Greene's math); ¶¶ 20-21 (speculating that the Product may contain magnesium oxide).) Greene claims she would not have purchased the Product, or would have paid less for it, if it truly did not contain the promised quantity of magnesium derived from magnesium citrate. (*Id.* ¶ 32.)

Greene's only source for the percentage of magnesium in magnesium citrate is Wikipedia. (*See* SAC ¶ 16 nn.2-3.) The two Wikipedia entries Greene cited in the SAC both begin with

warnings. The first, https://en.wikipedia.org/wiki/Magnesium_citrate (last visited Mar. 27, 2026), has the following at the top of it:

> This article **needs additional citations for verification**. Please help improve this article by adding citations to reliable sources. Unsourced material may be challenged and removed.
>
> *Find sources:* "Magnesium citrate" – news · newspapers · books · scholar · JSTOR *(January 2011) (Learn how and when to remove this message)*

The second, https://en.wikipedia.org/wiki/Magnesium_citrate_(3:2) (last visited Mar. 27, 2026), has the following at the top of it:

> This article **relies largely or entirely on a single source**. Relevant discussion may be found on the talk page. Please help improve this article by introducing citations to additional sources.
>
> *Find sources:* "Magnesium citrate" 3:2 – news · newspapers · books · scholar · JSTOR *(May 2023)*

The first entry states that "[o]ne form" of magnesium citrate is a "magnesium preparation in salt form with citric acid in a 1:1 ratio" that "contains 11.33% magnesium by weight."

> **Magnesium citrates** are metal-organic compounds formed from citrate and magnesium ions. They are salts. One form is the 1:1 magnesium preparation in salt form with citric acid in a 1:1 ratio (1 magnesium atom per citrate molecule). It contains 11.33% magnesium by weight. Magnesium citrate (*sensu lato*) is used medicinally as a saline laxative and to empty the bowel before major surgery or a colonoscopy. It is available without a prescription, both as a generic and under various brand names. It is also used in the pill form as a magnesium dietary supplement. As a food additive, magnesium citrate is used to regulate acidity and is known as E number E345.

https://en.wikipedia.org/wiki/Magnesium_citrate (last visited Mar. 27, 2026).

The second entry discusses "trimagnesium citrate," the form of magnesium citrate used in the Product, which the Wikipedia page says "contains 16.2% elemental magnesium by weight."

> **Magnesium citrate (3:2)** (3 magnesium atoms per 2 citrate molecules), also called **trimagnesium dicitrate**, **trimagnesium citrate**, or the ambiguous name **magnesium citrate**. The substance may come as anhydrous or hydrated salt with varying properties.
>
> The anhydrous salt has good solubility in water (~10% or more at 25 °C) and contains 16.2% elemental magnesium by weight. Its taste is slightly bitter-alkaline.

https://en.wikipedia.org/wiki/Magnesium_citrate_(3:2) (last visited Mar. 27, 2026).

Based on these alleged facts and Greene's assumptions, Greene asserts four causes of action sounding in fraud, breach of warranties, and violation of Georgia consumer statutes on behalf of both a nationwide and Georgia class of purchasers.

## LEGAL STANDARD

A complaint may only survive a Rule 12(b)(6) motion to dismiss if it pleads "enough facts to state a claim to relief that is plausible on its face." *Rivera v. S.C. Johnson & Son, Inc.*, 2021 WL 4392300, at *3 (S.D.N.Y. Sept. 24, 2021), *quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*, *quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court's obligation to accept well-pleaded *facts* as true does not extend to mere "assumptions and conclusions." *Stein v. Tangoe, Inc.*, No. 13 Civ. 286, 2014 WL 12767210, at *13 (D. Conn. Sept. 30, 2014), *quoting Incantalupo v. Lawrence Union Free Sch. Dist.*, 652 F. Supp.2d 314, 331 (E.D.N.Y. 2009). Courts consider claims to be "plausible" enough to survive motions to dismiss only where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Calvin v. Schmitt*, 2017 WL 4280683, at *4 (S.D.N.Y. July 7, 2017), *quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Well-pleaded facts "must be enough to raise a right of relief above the speculative level" and be "more than a sheer possibility that a defendant has acted unlawfully." *Wiggins v. Unilever U.S., Inc.*, 684 F.Supp.3d 127, 138 (S.D.N.Y. 2023) (quotes omitted). This determination "is context specific, requiring the reviewing court to draw on its experience and common sense." *Iqbal*, 556 U.S. at 663-64.

Plaintiff's claims sounding in fraud are also governed by Rule 9(b)'s heightened pleading standard. *See Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009); *DM Manager LLC v. Fidelity Nat'l Info. Servs., Inc.*, 2025 WL 863338, at *3 (2d Cir. Mar. 19, 2025); *Stern v. Electrolux Home Prods., Inc.*, 2024 WL 416495, at *4 (E.D.N.Y. Jan. 30, 2024), *R. & R. adopted at* 2024 WL 4297656 (E.D.N.Y. Sept. 26, 2024) (Azrack, J.).

Finally, "[w]here an individual plaintiff brings claims on behalf of themselves and a class but fails to state a claim, the court lacks jurisdiction to adjudicate the putative class claims." *Vaglica v. Reckitt Benckiser LLC*, 699 F.Supp.3d 200, 205-06 (E.D.N.Y. 2023).

## ARGUMENT

Because Greene premised her SAC on unjustified assumptions rather than readily obtainable laboratory analysis, the Court should dismiss the SAC without leave to replead.

### I. It is the Norm in this Circuit to Require Laboratory Testing for Claims Such as Those Greene Has Pleaded to Survive Motions to Dismiss.

Consumer fraud is a serious charge. Nutrition supplements like the Product at issue here are heavily regulated, and if Piping Rock is knowingly marketing the Product with an insufficient quantity of magnesium or the wrong source for it, it should be in serious trouble. The converse, however, is equally true: When a plaintiff like Greene rushes to court with inflammatory charges of consumer fraud and breach of warranty, unsupported by readily obtainable laboratory testing, it is the plaintiff (or, more likely, her attorney) who should be in trouble.

Requiring a plaintiff who claims inaccuracies in an ingredient list to allege laboratory analysis is far from unprecedented in this Circuit. It is the norm. As an example, in *Rivera v. S.C. Johnson & Son, Inc.*, No. 20 Civ. 3588, 2021 WL 4392300, at *1 (S.D.N.Y. Sept. 24, 2021), a serial filer of consumer fraud claims rushed to court asserting that the ubiquitous consumer product Windex could not lawfully market itself as "Non-Toxic" because it allegedly contained "ingredients that may be harmful to humans, pets, or the environment." The plaintiffs' complaint listed 13 potentially toxic ingredients and alleged that "these ingredients are capable of causing certain harmful effects in their 'in-use concentrations.'" *Id.* at *2. But the plaintiffs did not claim to know how much of the allegedly toxic ingredients Windex actually contains, *see id.*, and that

was fatal to their claim because "they have not adequately alleged that the product is actually toxic, even according to their own definition," *id.* at *4.

The plaintiffs in *Rivera* argued "that they had no choice but to plead their claims in the manner they did because 'Defendant does not disclose [on the Windex label] the ingredients' concentrations or percentages by weight.'" *Id.* at *5. The court rejected that argument because "Plaintiffs might have attempted to analyze the Products, which are widely available," and because "[i]n similar cases, testing of the product at issue is common." *Id.* (citing cases). For that reason, the court held, complaints of this nature must include test results or "allegations as to why such testing would not have been possible." *Id.* Without one or the other, plaintiffs do not meet "their obligation to allege facts upon which the Court can infer more than the mere possibility of misconduct." *Id.* at *6 (internal quotation marks and citation omitted).

The court in *Wiggins v. Unilever U.S., Inc.*, 684 F. Supp.3d 127, 134 (S.D.N.Y. 2023), reached the same conclusion. There, plaintiffs who bought various shampoos and washes alleged that the products contained ingredients that should have precluded the manufacturer from marketing them as "hypoallergenic" and "tear-free." Just like the plaintiffs in *Rivera*, however, they did not (with one exception) allege the amount or concentration of the challenged ingredients in the products they used. *See id*. at 149-50. Agreeing with the analysis in *Rivera*, the court rejected the plaintiffs' argument "that they need not marshal their evidence in a complaint," because the complaint did not explain "how [p]laintiffs came to such information and belief or what facts, if any, support their conclusions." *Id.* (cleaned up). Among other infirmities, the plaintiffs did not "offer[] test results or expert reports demonstrating that the concentration of the allegedly harmful ingredients" in "products that are widely available and were sold to hundreds of thousands of

consumers throughout the United States" could "cause such harm." *Id.* at 151. Accordingly, they could not show that the product label was misleading. *Id.*

In a case decided more recently, *Dib v. Apple Inc.*, 2026 WL 483057 (N.D. Cal. Feb. 20, 2026), the court dismissed "greenwashing" claims based on nothing more than the plaintiffs' attorneys' own analysis. "Plaintiffs failed to allege that the methodology underlying their work is accepted in any scientific circles, or that anyone else—scientist or otherwise—has endorsed the accuracy of their work." *Id.* at *8. Plaintiff's allegations here have even less support than those the court found sorely lacking in *Dib*.

Greene's counsel here, in their pre-motion letter to the Court dated July 2, 2025, cited two California cases as supporting their view that Greene need not allege possession of laboratory test results. (DE 17 at 2.) Neither case remotely supports that position. In *Lozano v. Bowmar Nutrition LLC*, the plaintiff "append[ed] to [her complaint] laboratory reports which purportedly support her allegations that six of Defendant's products lack the protein content presented on the products' labels." 2021 WL 4459660, at *5 (C.D. Cal. Aug. 19, 2021). The defendant argued that the plaintiff failed to plead that the tests were "conducted in compliance with FDA-mandated methodology," but the court disagreed that "federal pleading standards" require this. *Id.* at *5-6. The court did not say the plaintiff's allegations would have been plausible without the test results she appended to her complaint, which Greene lacks. (*Contra* DE 17 at 2.) In *Amavizca v. Nutra Mfg., LLC*, "Plaintiff's counsel sent some of the contents of the bottle [of a supplement] that Plaintiff had purchased in May 2019 to a laboratory for analysis," and then had the laboratory test other samples of the product, as well. 2020 WL 8837145, at *1-2 (C.D. Cal. Oct. 20, 2020). That defendant, too, argued that the plaintiff's complaint did not allege the lab complied with particular testing

methodologies, but the court disagreed. *See id.* at *5. Both cases, therefore, support Piping Rock's position that a plaintiff's claims of this sort are not plausible without laboratory testing.

Indeed, even in some cases where a plaintiff has alleged a laboratory analysis, courts nevertheless have *still* dismissed claims at the pleading stage where the plaintiffs themselves did not conduct the testing or failed to plead how the tests were conducted. For example, in *Gaminde v. Lang Pharma Nutrition, Inc.*, the plaintiff alleged that a product advertised as containing 300 milligrams of Omega-3 Krill Oil contained less than that amount. 2019 WL 1338724, at *1 (N.D.N.Y. Mar. 25, 2019). The plaintiff based his allegations on "independent research funded by the United States Department of Agriculture and published in the *Journal of the Science of Food and Agriculture*." *Id.* (cleaned up). The plaintiff, however, "fail[ed] to allege that he tested the CVS Krill Oil that he purchased [or] had an independent laboratory test it." *Id.* The court dismissed the case on standing grounds, considering it to be "speculation to allege that because two CVS Krill Oil bottles in a USDA study were found to have less than the stated amount of Omega-3 Krill Oil, the bottle that [the plaintiff] purchased must as well." *Id.* at *2. The plaintiff's "failure to allege that he tested his bottle of CVS Krill Oil . . . is fatal." *Id.* at *3.

In *Dunning v. Supergoop, LLC*, the plaintiffs claimed that the defendant's sunscreen contained a lower SPF level than advertised on the product's label. 2025 WL 34822, at *1 (S.D.N.Y. Jan. 6, 2025). The plaintiffs claimed to have conducted an SPF test "in accordance with FDA regulations for determination of SPF Label Value" and that their testing showed the product had an SPF Label Value lower than advertised. *Id.* at *2. The court dismissed the case on standing grounds because the "sparse factual allegations" did not convince the court that the mislabeling allegations were "anything more than a sheer possibility." *Id.* at *6 (cleaned up). The court explained three issues with the "testing" plaintiffs performed: (1) there were "no allegations of the

purchase dates of the samples that were tested" and did not "allege whether the Tested Products were purchased before or after Plaintiffs made their purchases," so the court could not "evaluate temporal proximity" to the plaintiffs' purchases; (2) the plaintiffs did "not disclose the number of samples tested" in order to demonstrate their testing adhered to FDA regulations; and (3) the plaintiffs did "not allege where the Tested Products were purchased," "that they were purchased in geographic proximity to where [p]laintiffs made their purchases," or that "the Products were produced in a consistent manner through a standardized manufacturing process." *Id.* at *5. "[W]hile [p]laintiffs claim to have used a standard testing methodology on some unspecified date on some unspecified number of products, that along is insufficient to draw a meaningful link between the Products that were tested and those that [p]laintiffs purchased." *Id.* at *6.[1]

Though not a Second Circuit case, *Fahey v. Deoleo USA, Inc.*, 2018 WL 5840664, at *2-3 (D.D.C. Nov. 8, 2018), is in accord. There, a plaintiff sued an olive oil manufacturer based a university study finding that the olive oil products were not of sufficient quality to be marketed as "extra virgin," but the plaintiff did not have a laboratory test the bottle of olive oil he purchased. The plaintiff offered "no explanation for why the testing done on three bottles . . . eight years ago should tell us anything about the quality" of the product being sold at the time of the suit. *Id.* at *2. Accordingly, the court dismissed the case for failure to state a claim. *Id.* at *3.

Here, as in these other cases, Greene and her counsel could have readily tested the Product to determine the quantity and source of magnesium it contains. Any such testing would have

---

[1] The plaintiffs in *Supergoop* filed a second amended complaint, which the court also dismissed. The plaintiffs alleged that they conducted certain testing, but after examining those allegations, the court could not "conclude that mislabeling in the Purchased Products was anything more than a sheer possibility." *Dunning v. Supergoop, LLC*, 2026 WL 501627, at *1, *6-7 (S.D.N.Y. Feb. 24, 2026) (cleaned up).

demonstrated that the Product's label is accurate. Without reputable test results—which Greene would not be able to obtain—none of her claims are plausible.

Greene's counsel litigated another magnesium supplement case that survived a motion to dismiss—*Cohen v. Nutricost*, 747 F.Supp.3d 467 (E.D.N.Y. 2024)—and Greene may argue that the *Cohen* decision supports her claims. It does not. The single-ingredient magnesium glycinate supplement in *Cohen* was in a capsule form, meaning the product's volume was limited by the size of the capsule. That is not true of a gummy, which is a baked product not encased in a capsule or other size-limiting vessel. The *Cohen* product's packaging promised 420 milligrams per serving of magnesium derived from magnesium glycinate, but the plaintiff in *Cohen* alleged that to be impossible because it would require nearly twice the amount of magnesium glycinate the capsules stated they contained. *See id.* at 471-72. The plaintiff in *Cohen* also alleged that consumers of the supplement reported physical symptoms consistent with use of magnesium in a different form—*e.g.*, magnesium oxide—which contains a higher concentration of magnesium and is used as a laxative. *See id.* at 478.

The *Cohen* court's decision that the plaintiff sufficiently pleaded her claim does not help Greene in this case for multiple reasons, starting with the fact that the defendant in *Cohen* did not argue for dismissal based on the absence of laboratory testing. Indeed, the defendant did not even dispute that the plaintiff's factual allegations were correct. *See generally Cohen*, DE 22-1 (Def.'s Motion to Dismiss, dated Feb. 1, 2024). Here, by contrast, Greene's counsel have been on notice since Piping Rock's first pre-motion letter (DE 10), that (1) Piping Rock vigorously disputes the allegation that the Product contains less than the promised amount of magnesium from magnesium citrate; and (2) Piping Rock intended to argue, based on a raft of precedent from Second Circuit courts unaddressed in *Cohen*, that the claim is not plausible without reputable laboratory testing.

Further, Piping Rock has shown here, as the defendant in *Cohen* did not, that Greene's purported calculations about magnesium citrate content in the Product are simply wrong.

Without laboratory testing, or at least without the other allegations in *Cohen* that might have served as a substitute for testing (had the defendant in *Cohen* raised the absence of testing), Greene's allegations in this case are implausible. The Court should dismiss them.

Because the Court and relevant Federal Rules already permitted Greene leave to amend her complaint twice, the Court should deny further leave to amend and dismiss the case with prejudice. *See, e.g.*, *Albert v. Distrokid LLC*, No. 25 Civ. 1705, 2026 WL 710041, at *18 (S.D.N.Y. Mar. 13, 2026) (denying further leave after only one prior amendment); *Botterio v. Tessel*, 2025 WL 3718713, at *7 (E.D.N.Y. Dec. 23, 2025) (denying further leave after two prior amendments) (citing *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008) ("[M]otions to amend should generally be denied in instances of . . . repeated failure to cure deficiencies by amendments previously allowed.")).

* * *

If the Court agrees with Piping Rock that Greene's SAC is implausible without allegations that Greene caused the product to be tested in a laboratory and that the test results support her claims, the Court should dismiss all of Greene's claims on this basis. Additionally, as explained below, several of Greene's claims are subject to dismissal for other reasons, too.

## II. Greene's Georgia Fair Business Practices Act and Fraudulent Concealment Claims Fail Because the SAC Does Not Satisfy Fed. R. Civ. P. 9(b), and Greene Cannot Establish Any Legally Cognizable Duty on the Part of Piping Rock.

In Georgia, a claim for fraudulent concealment requires "the same five elements [as in] a fraud claim," which are "(1) a false representation or omission of a material fact"; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages." *Giddens v. TIFT Regional Health Sys., Inc.*, 2026 WL 555070, at *3 (M.D. Ga.

Feb. 27, 2026); *Williams v. Dresser Indus., Inc.*, 120 F.3d 1163, 1167 (11th Cir. 1997). In addition, "where a fraud claim is based on the alleged failure to disclose a material fact, liability arises only if there exists an obligation to disclose the fact." *McClure v. Toyota Motor Corp.*, 759 F.Supp.3d 1333, 1357 (N.D. Ga. 2024). Greene's claim under the Georgia Fair Business Practices Act, Ga. Code Ann. § 10-1-390 *et seq.*, similarly alleges that Piping Rock fraudulently described the magnesium content and/or source in the Product. (*See* SAC ¶¶ 62, 67-68.) Both claims require Greene to satisfy the heightened pleading standard of Rule 9(b). *See supra* at 6. Yet, because Greene did not allege that she caused the Product to be tested and that test results support her claims, Greene has not even satisfied Rule 8, much less Rule 9(b). And Greene's SAC does not plead any cognizable duty on the part of Piping Rock.

***First***, Greene's claim fails because Piping Rock was under no duty to disclose more than it did. For Piping Rock to have such a duty, there must either be a confidential relationship between the parties (none is alleged), or "the particular circumstances of the case" must demonstrate a concealment of facts "which the other party *by the exercise of ordinary prudence and caution could not discover*." *McClure*, 759 F.Supp.3d at 1358 (emphasis in original); *see also* Ga. Code Ann. § 23-2-53. "An obligation to disclose must exist before a party may be held liable for fraud based upon the concealment of material facts." *Williams*, 120 F.3d at 1167.

To illustrate, in *Francoforte v. Graco Children's Products, Inc.*, the plaintiffs alleged that the defendant "fraudulently concealed that the [defendant's] Booster Seats would not properly protect an intended user during a crash." 2026 WL 582859, at *2 (N.D. Ga. Jan. 7, 2026). As here, there was no confidential relationship between the parties, so the plaintiffs had to "demonstrate a duty based on the 'particular circumstances of the case.'" *Id.* The court found no such duty because the plaintiffs did not purchase the product directly from the defendant but "from third-party

retailers." *Id.* at *3. As such, the defendant "was not aware of [the plaintiffs'] purchases, and [the plaintiffs] were remote purchasers in an arm's length transaction." *Id.* (cleaned up). The court specifically rejected the plaintiffs' argument that the defendant had "aggressively advertised" the product's qualities because (1) "the particular circumstances of the case should involve dependent relationships sufficient to overcome the will of a party"; and (2) no cited precedent held that "advertising and marketing of a product were sufficient to form a dependent relationship between the parties." *Id.* (cleaned up). That was fatal to both plaintiffs' claims of fraud and those arising under the Georgia Fair Business Practices Act.

The same result should follow here. Greene alleges that she purchased the Product, not from Piping Rock, but from "a Kroger grocery store." (SAC ¶ 4.) And the "front and back label" on which Greene claims to have relied, (*id.*), is the same sort of advertising that the *Francoforte* court determined did not create any type of dependent relationship between the parties. *See* 2026 WL 582859, at *3.

Critically, even if Piping Rock's knowledge of the Product's contents *could* provide a basis for Greene's claims of fraud, her own allegations rebut that it *should*. The crux of Greene's complaint is that, based solely on the Product's label—which she claims to have viewed (SAC ¶ 69)—and two Wikipedia pages, arithmetic shows the quantity of magnesium from magnesium citrate in the Product. Although Greene arrived at an incorrect conclusion (because she did not account for the regulation-mandated rounding to the nearest gram for the carbohydrate contents of the Product), nothing about the magnesium content of the Product was withheld from her, and certainly not by Piping Rock.

***Second***, Greene's claims under the Georgia Fair Business Practices Act must be dismissed because she failed to plead that she provided pre-suit notice to Piping Rock prior to filing this

lawsuit. Georgia law requires that “[a]t least 30 days prior to the filing” of an action under the Georgia Fair Business Practice Act, “a written demand for relief . . . shall be delivered to any prospective respondent.” Ga. Code Ann. § 10-1-399; *Carder v. Graco Children’s Prods., Inc.*, 558 F.Supp.3d 1290, 1328 (N.D. Ga. 2021) (dismissing Georgia Fair Business Practices Act claims for lack of pre-suit notice); *Paws Holdings, LLC v. Daikin Applied Americas Inc.*, 2018 WL 475013, at *5 (S.D. Ga. Jan. 18, 2018) (same).

Greene alleges that Piping Rock “distributes and sells its [Product] throughout the United States,” (SAC ¶ 5), and that Greene purchased the Product in Georgia (*id.* ¶ 4). She does not, however, allege that she sent an appropriate pre-suit notice to Piping Rock prior to initiating this lawsuit. As such, her claim under the Georgia Fair Business Practices Act must be dismissed.

## III. Greene’s Express Warranty Claim Fails for the Additional Reason That She Fails to Plead She Provided Notice of the Alleged Breach.

“Georgia law imposes two conditions before a breach of a written warranty can exist: (1) notice of the defect, and (2) a reasonable opportunity to repair the defect.” *Knight v. American Suzuki Motor Corp.*, 612 S.E.2d 546, 549 (Ga. App. 2005); *Paws Holdings, LLC*, 2018 WL 475013, at *5. Greene does not plead that she provided Piping Rock with notice of her warranty claim. The Court should dismiss her warranty claim for that additional reason.

## IV. Greene’s Implied Warranty of Merchantability Claim Should Be Dismissed for the Additional Reason That She Is Not in Privity with Piping Rock.

The Product would not be “unmerchantable” if it contained the promised quantity of magnesium. Even if such a claim were possible, moreover, Greene purchased her Product “at a Kroger grocery store in Cumming, Georgia on June 14, 2024.” (SAC ¶ 4.) She does not plead that she transacted with Piping Rock. “In order to assert a claim for breach of an implied warranty of merchantability” under Georgia law, however, “Plaintiff must be in privity with Defendant.” *Paul*

*v. Ingersoll-Rand Co.*, No. 10 Civ. 708, 2011 WL 13269791, at *1 (N.D. Ga. Jan. 14, 2011). Because Greene is not in privity with Piping Rock, her implied warranty claim fails.

**CONCLUSION**

For the reasons stated above, the Court should dismiss Plaintiff Andrea Greene's claims with prejudice.

Dated: New York, New York
March 27, 2026

FAEGRE DRINKER BIDDLE & REATH LLP

By: ______________________________
Jeffrey S. Jacobson
Jeffrey.Jacobson@faegredrinker.com
1177 Avenue of the Americas, 43rd Floor
New York, NY 10036
Tel.: 212 248 3140

*Attorneys for Defendant*
*Piping Rock Health Products, Inc.*

**WORD COUNT CERTIFICATION**

I, **W. JOSHUA LATTIMORE**, of full age and an associate at the law firm Faegre Drinker Biddle & Reath LLP, attorneys for Defendant Piping Rock Health Products, Inc. in this action, hereby certify, pursuant to Local Civil Rule 7.1(c), that the foregoing Memorandum in Support of Motion to Dismiss, exclusive of the caption, table of contents, table of authorities, and signature block, contains 4,791 words as counted by Microsoft Word and is in compliance with the word-count limitations of Local Civil Rule 7.1(c); and I certify under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: New York, New York
March 27, 2026

By: W. Joshua Lattimore
W. Joshua Lattimore