# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ANDREA GREENE, on Behalf of Herself and All Others Similarly Situated,

Plaintiff,

v. Civil Action No. 2:24-cv-08383-JMA-LGD

PIPING ROCK HEALTH PRODUCTS, INC. D/B/A NATURAL VITALITY,

Defendant.

---

DEPOSITION OF ABE VAYNBERG

DATE: Thursday, August 13, 2026

TIME: 10:05 a.m.

LOCATION: Remote Proceeding
Pietragallo Gordon Alfano Bosick & Raspanti, LLP
50 Lake Center Drive
Marlton, NJ 08053

REPORTED BY: Abagail Rodriguez

JOB NO.: 8385036

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF ANDREA GREENE:

SERGEI LEMBERG, ESQUIRE (by videoconference)
Lemberg Law LLC
43 Danbury Road
Wilton, CT 06897
slemberg@lemberglaw.com
(203) 653-2250, X5500

ON BEHALF OF DEFENDANT PIPING ROCK HEALTH PRODUCTS, INC. D/B/A NATURAL VITALITY:

MICHAEL W. STARK, ESQUIRE (by videoconference)
Faegre Drinker Biddle & Reath LLP
1500 K Street NW, Suite 1100
Washington, DC 20005
michael.stark@faegredrinker.com
(202) 230-5252

JEFFREY JACOBSON, ESQUIRE (by videoconference)
Faegre Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932
jeffrey.jacobson@faegredrinker.com
(212) 248-3191

that, where'd you work?

A Clorox/Piping Rock.

MS. FISHER: Just keep your voice up.

BY MR. LEMBERG:

Q How long were you at Piping Rock?

A Two months, I believe.

Q And prior to that, where did you work?

A Clorox.

Q And how long were you at Clorox?

A Four years, plus or minus few months.

Q "Four years"?

A Plus -- yes, four years -- rounding it up, numbering up.

Q What was your job there?

A The title is Senior Manager, Engineering. I was responsible for gummy operation and other operation required. But gummy was the primary focus, to be specific.

Q Tell me your educational background?

A. VAYNBERG

realized that somebody's asking questions about the gummies.

Q Okay. Nobody else other than me prior to that had contacted you. Fair to say?

A Correct.

Q Okay. So, to summarize, you were at Clorox for some four years or so, and then when Clorox was acquired by Piping Rock, you stayed with Piping Rock for two months, and then you left; fair?

A Correct.

Q And when was your -- give or take, your last date of employment with Piping Rock?

A I think November '24.

Q How many gummy formulations were you in charge of when you were at Piping Rock, or Clorox, for that matter?

MR. COFFINA: Objection. Vague.

Can we just define what you mean when you say "formulations," so we can --

MR. LEMBERG: Sure.

BY MR. LEMBERG:

A. VAYNBERG

at Clorox, how many -- and I know this is a broad question -- how many products, approximately, were you involved with overseeing or monitoring?

A So over my career, there were six or seven products were made with me being -- it was observing to the production, if not -- some of them did not have problems and did not -- did not need any improvements. But I was witness, let's call it, to six, seven, maybe eight products --

Q Okay. And the particular gummies that we're talking about here today, the CALM Gummies Magnesium Supplement, Raspberry-Lemon Flavor, 330 milligrams, were those gummies one of the products that you were involved with while you were at Clorox?

A Yes. Yes.

Q Were those gummies formulated in New York, or elsewhere?

A That precedes my time.

Q While you were at Clorox, where

A. VAYNBERG

A Please. Yes.

Q Okay. So what was your role with respect to the CALM Gummies that I just showed you, which is the CALM Gummies Magnesium Supplement, Raspberry-Lemon product?

A Would be responsible for the quality, would be responsible for the operation, making sure that we produce them efficiently.

Q Were you responsible for the formulation as well?

A I'm not responsible for the formulation. You need to define the word "formulation."

Q Sure. Well, tell me what you mean by that word?

A A formulation is what you see on the label of the jar. I am not responsible.

Q What about formulation as it pertains to the chemical composition of the product?

A Yes. So there, I have a freedom

A. VAYNBERG

THE WITNESS: I do not know. It's regulatory. I'm not -- not -- I'm not involved in this. I -- there's really nothing for me to say.

BY MR. LEMBERG:

Q Okay. Now let's look at the composition of Version 3. Do you see it in front of you, sir?

A Yeah.

Q Do you see how much magnesium citrate is in -- is the charge weight in each gummy for Version 3?

A You're referring to which column, please?

Q I'm referring to Column K.

A Yes, I can see the numbers.

Q And how much is the charge weight for each gummy in Column K?

A The number for material 6152 in Row 17 is 533.50.

Q Okay. And it says "Active grams, 33 milligrams." Do you see that?

A Per gram. Not per gummy. Per gram.

A. VAYNBERG

Q "Per gram"?
A So with the gummy, that would be multiple of the weight of the gummy.
Q Now, the -- since we see the charge weight, we can calculate how much elemental magnesium was in each gummy and -- as of Version 3. Can we not?
A Numbers shown here can be used in calculating amount of magnesium in each gummy.
Q Okay. So -- and the math -- the arithmetic that you do is you take 533.50 and multiply by 0.114, which is 11.4 percent; correct?
A That is correct procedure.
Q And when I do that, I get 60.1 milligrams of magnesium; correct? Elemental magnesium, in each gummy?
A That needs to be double-checked.
Q That's fine. Feel free to use your calculator?
A 114, 60.8 milligrams of magnesium.
Q Okay. And so remember when we

A. VAYNBERG

were talking about Version 4, we calculated the amount of elemental magnesium in each gummy as 82.5 milligrams; remember?

A Yes.

Q Okay. And you will agree with me that in Version 3 the amount of elemental magnesium that should be in each gummy is 60.8 milligrams; correct?

A I agree with the calculating and multiplying volume in Column K17, by 0.114. I am not making a statement as to the gummies at that time containing magnesium at the level of 60.8 milligrams per gummy would that be correct extension of what we're doing here.

Q Okay. Well, tell me what the extension -- how much elemental magnesium was in each gummy based on Version 3 of the gummy?

A Perfect. What I will do next is to give a bit of explanation as to the discrepancy between the exhibits.

Q Go ahead?

A. VAYNBERG

and I do my calculations for living, I felt it was time to make sure that whatever calculations existed before it had no justification and no reference were properly captured.

And so, to put the fat line to what I'm saying and come to the conclusion as to what I'm saying, the numbers, looking at Exhibit 3, are erroneously wrong numbers, not properly calculated.

And I will say as a second statement to the statement that the underlying cooking quantity instructions has never been changed from the time I entered. Just to repeat myself, the numbers have been properly captured and corrected.

Q Okay. So we'll get to the cooking and the batch making. We'll get to that. I just want to look at the formula.

You will agree with me that the amount, the charge weight of the magnesium citrate in Formula 3 is 535 --

A. VAYNBERG

533.5 milligrams, which is less than the charge weight in Version 4 that you and I looked at, which is 751.3 milligrams; fair?

A If you multiply 533.5 by 0.114, you arrive to 60-point-some milligram, instead of desired 80-some.

Q Right. So now let's do this trick. Let's see if it works. I want to put Version 3 and Version 4 side by side.

A Right.

Q And did I understand you correctly that you don't know who made Version 3?

A Zero understanding.

Q Okay. So let's look at them together. Are you able to see them side by side here?

A Not really.

Q Oh, let's see. I think I can manage this.

A But ask the question, if it's not too difficult.

Q Well, I want to look at a bunch

A. VAYNBERG

recipe for muffins. A stick of butter, a -- sugar; right? Is a formula specification like a recipe?

A I -- I don't -- don't take muffins. I know where -- I -- if -- if I get my grandmother's recipe that takes -- says take a stick of butter, I'll use stick of butter, if that's where you're going to.

Q Okay. I'm just trying to figure out, a formula specification is like a recipe. To make, you know, these gummies, you got to use these ingredients in these proportions. Is this correct?

A That's correct. What we're looking at is not a recipe.

Q What is it?

A It's an idiot who's doing poor calculations.

Q Okay. And do you know what the result of that idiot's poor calculations was, whether the gummies were manufactured according to the idiot's poor calculations, or not?

A. VAYNBERG

A The gummies were calculated by the instruction, which actually was -- was part of the exhibits before. This is not part of what goes into making the gummy. It is somebody just making a poor record that is getting away with it.

Q Okay. But do you know whether the gummies -- prior to your formula change in March of 2024, do you know whether the gummies were manufactured according to this "idiot's" -- in your words -- formulation, or not?

MR. STARK: Objection. Asked and answered.

THE WITNESS: Yes. So I apologize for using word "idiot." It's not professional --

BY MR. LEMBERG:

Q You can --

A -- we'll call him --

Q -- call him incompetent person --

A -- we'll call him "somebody else." The recipe as shown as one of the

A. VAYNBERG

exhibits, that was called in the day, that's your grandmother's recipe for the number of butter sticks used in the production. This is calculation based on that recipe used in production, improperly calculated, settling.

Q Okay. So when you came in, in March of '24, part of your job was to standardize the recipe and make sure that the calculations were correct?

A I never changed the recipe. That is -- would be a -- the answer to that statement is no.

Q Okay. Now let's just stick to Version 4 for now -- I'm sorry -- to Version 3 for now. Suppose I wanted to know -- right -- whether the manufacturing process was aligned with the formulation with Version 3; right?

And suppose I wanted to know whether the percentage of magnesium citrate in the manufacturing records was similar to what is in the formula in Version 3; right?

A. VAYNBERG

A It's a multidimensional statement, so I cannot answer it in a way that it would make things clear. There are some losses, there are overages, and so that's a complex question, which is not "yes" or "no" answer.

Q Okay. So to summarize where we are now, your testimony is Version 3 is a bad recipe, but the manufacturing was always correct?

A That's correct.

MR. COFFINA: Objection. Objection. That mischaracterizes the statement --

MR. LEMBERG: Well, the witness can --

BY MR. LEMBERG:

Q Go ahead. Please rephrase it?

A What we're looking at in Exhibit 3 is improperly calculated levels of magnesium based on the formula that has never been changed vis-a-vis the amount of magnesium used. This is improperly calculated formula, which whoever calculated made a mistake, and it was

A. VAYNBERG

overlooked by whoever was a gatekeeper.

But this is -- this is not the representation of the final product. It rather said statement of somebody's inability to properly calculate.

Q That's what you believe; correct?

A This is what I know.

Q "This is what I" -- okay. Now let's look together. Do you see the weight of magnesium citrate in Version 3 is 533.5?

A Yes.

Q And do you see the charge weight of magnesium citrate in Version 4 is 751 milligrams -- 751.3?

A The word "charge weight" is misleading because it refers to the words of the grandmother's recipe. So I would not use the word "charge." I would say --

Q What word would you like to?

A -- so this is calculated based on the recipe amount, which is formula specification.

A. VAYNBERG

different?

And you say that "yes" -- you said that "yes," the test was -- to test the hypothesis, you could look at the batch records? And so --

A No.

Q I'm sorry?

A That is not correct. I said the -- the batch records represents the true gummy-making ingredients was going in the cooking, and Version 3 is incorrect calculation based on what goes into cooking.

But not the batch record could be proven or used as a proof or disproof of accuracy of -- of a document 3 or 4. I did not imply that.

MR. LEMBERG: Let's take a quick break, and then we'll finish up.

THE WITNESS: Okay.

MR. LEMBERG: It's 11:48.

THE WITNESS: Yeah.

MR. COFFINA: When would you like to go back?